## MERCK & Co. *v.* UNITED STATES (No. 1340).[1]

1. ALKALOIDS OF OPIUM.

The alkaloids here are produced from morphine, but morphine is derived from opium, and in paragraph 43, tariff act of 1897, "alkaloids" is employed to embrace generically all known or possible alkaloids of opium, and it embraces codeine.

2. SALTS OF OPIUM.

While there are no salts of opium proper, that expression in paragraph 43 should be interpreted to mean such salts as are produced by the chemical action of an acid radical on organic bases that are component parts of opium. The merchandise was dutiable under that paragraph.—United States *v.* Merck & Co. (168 Fed., 244.)

### United States Court of Customs Appeals, April 5, 1915.

APPEAL from Board of United States General Appraisers, G. A. 7517 (T. D. 33998).

[Affirmed.]

*Comstock & Washburn* (*Charles A. Darius* on the brief) for the appellants.

*Bert Hanson,* Assistant Attorney General (*Charles E. McNabb,* assistant attorney, of counsel), for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

SMITH, Judge, delivered the following opinion of the court:

Goods invoiced as codeine hydrochlorate, codeine sulphate in powder, codeine pure crystals, and codeine pure precipitate, imported at the port of New York, were classified by the collector of customs as salts of opium and assessed for duty at $1 per ounce under the provisions of paragraph 43 of the tariff act of 1897, which, in so far as pertinent, reads as follows:

43. Opium, * * * one dollar per pound, morphia or morphine, sulphate of, and all alkaloids or salts of opium, one dollar per ounce; * * *.

The importer protested that these several articles of merchandise were not alkaloids or salts of opium within the purview of paragraph 43, but that they were either medicinal preparations dutiable at the rate of 25 per cent ad valorem under paragraph 67 or paragraph 68, or chemical compounds dutiable at the same rate under the provisions of paragraph 3 of said act.

Paragraphs 67 and 68 and paragraph 3, in so far as pertinent, are as follows:

67. Medicinal preparations containing alcohol, or in the preparation of which alcohol is used, not specially provided for in this act, fifty-five cents per pound, but in no case shall the same pay less than twenty-five per centum ad valorem.

68. Medicinal preparations not containing alcohol or in the preparation of which alcohol is not used, not specially provided for in this act, twenty-five per centum ad valorem; * * *.

3. Alkalies, alkaloids, distilled oils, essential oils, expressed oils, rendered oils, and all combinations of the foregoing, and all chemical compounds and salts not specially provided for in this act, twenty-five per centum ad valorem.

[1] Reported in T. D. 35315 (28 Treas. Dec., 583).

The Board of General Appraisers overruled the protest and the importers appealed.

At the hearing before the board, Dr. Albert Knoll, a member of the firm of Knoll & Co., manufacturers of the goods under discussion, testified on behalf of the importers that he was chief chemist of the firm and the inventor of the process for the synthetic production of codeine from morphine. He stated that the merchandise in controversy was synthetically prepared by dissolving morphine in an alcoholic solution of alkali and then heating the resulting solution to a temperature of 110° C. under pressure, after the addition of a methyl ether. On this evidence the appellant contends that the goods in question, whether in the form of pure codeine, codeine sulphate, or codeine hydrochlorate, are not alkaloids or salts of opium but salts of morphine, and that they are therefore not dutiable under paragraph 43, inasmuch as that paragraph does not provide for salts of morphine. To sustain that contention, the provision in paragraph 43 covering "all alkaloids or salts of opium" would have to be limited to those alkaloids or salts secured directly and immediately from opium as the raw material, and that limitation we can not make without doing violence to what we think was the manifest purpose of the legislation. As appears from the authorities, opium is a very complex substance indeed, containing, as it does, 18 and possibly 20 different organic bases, to say nothing of neutral compounds or of the acids with which some of the bases are combined. A few of the bases are free, but most of them are combined with sulphuric and meconic acids. Whether combined or free, however, none of the bases can be directly or immediately separated or obtained from opium. Indeed, a succession of mechanical and chemical processes is apparently required to isolate the base desired and to eliminate those not required. Fownes' Elementary Chemistry (p. 1008); Dictionary of Applied Chemistry (Thorpe, Vol. III, p. 71).

The bases in opium, so far as identified by science, are morphine codeine, hydrocotarnine, thebaine, pseudomorphine, codamine, laudanine, laudanosine, meconidine, papaverine, lanthopine, protopine, cryptopine, narcotine, oxynarcotine, narceine, gnoscopine, tritopine. These several organic bases constitute the active vegetable principles which are peculiar to opium, and as, like alkalies, they have the faculty of chemically combining with acids to form salts, they are generically known as alkaloids of opium. See "Alkaloid" (Century Dictionary, Worcester's Dictionary, and Watts' Dictionary of Chemistry); "Opium" (Townes' Elementary Chemistry, 1008); "Opium" (Dictionary of Applied Chemistry, Thorpe, 71).

At the time the tariff act of 1897 was passed these organic bases were known to be alkaloids derived only from opium as the basic material, and when provision for alkaloids of opium was made in

paragraph 43 of that act it must be presumed that Congress had these substances in mind and that the generic designation "alkaloids * * * of opium" was intended by it to cover each of the alkaloids above enumerated just as specifically as if it had been mentioned by name. What concerned Congress when it determined to subject alkaloids of opium to a duty of $1 per ounce was not the chemical or other processes by which those substances were produced, but the substances themselves. In other words, what Congress was aiming at was morphine, codeine, thebaine, papaverine, narcotine, etc., belonging to the class of organic bases known as alkaloids of opium, and that it elected to identify these several compounds by a group term which included them all rather than by an *eo nomine* enumeration finds its explanation, we think, in the fact that the general designation had the merit of brevity and at the same time was broad enough to embrace not only the known alkaloids of opium but also those which might be discovered.

But even if the statutory expression "alkaloids * * * of opium" were not considered as a class designation and were given the same meaning as if it had read "alkaloids derived from opium," we are of opinion that the codeine here involved would still be dutiable under paragraph 43, inasmuch as it was derived from opium as the basic material. True, it was not directly produced from opium, but from morphine. Nevertheless, as morphine is a constituent of opium and is itself obtained from opium, we think that codeine evolved from morphia may very properly be regarded as a derivative of opium, since its production as well as that of morphine is wholly dependent on the existence of the opium.

It may be, as contended by the importers, that the chemical combination brought about by dissolving morphia in an alcoholic solution of alkali and then adding methyl ether after heating produces a salt, but whether it does or not, the fact remains that the product is identical with codeine, which is a recognized alkaloid of opium, and therefore dutiable under paragraph 43, as we interpret that provision.

Considering, as we do, that codeine is provided for in paragraph 43 under the generic designation "alkaloids * * * of opium," the next question to be determined is whether the hydrochlorate of codeine and the sulphate of codeine, which are not alkaloids of opium, can be classified as "salts of opium." A salt, chemically speaking, is a compound of a basic with an acidic radical. See "Salt" (chem.), Standard Dictionary. Codeine hydrochlorate is a chemical combination of the organic base codeine with hydrochloric acid and codeine sulphate is a combination of the same base with sulphuric acid. Both these substances are therefore salts in the chemical sense of the term, and as the organic base of both was codeine, both, in accordance with strict chemical terminology, must be regarded as salts of codeine.

Whether they are at the same time "salts of opium' within the intention of paragraph 43 depends wholly on whether that provision shall be literally construed or given a meaning broad enough to cover salts evolved by chemically combining an acid with some organic base of opium.   We think that a literal construction of the provision would render it meaningless and ineffective, and that to make it operative an interpretation must be put upon it other than that to be implied from the literal signification of the words actually used.   As we have already stated, opium itself is not an organic base, but a complex substance made up of many organic bases and some neutral compounds and acids, and from that it apparently follows that any chemical reaction produced by bringing an acid radical into contact with opium would result, not in the chemical union of the acid and the opium, but in a chemical combination of the acid with some of the organic bases which are constituents of opium.   As was said by Dr. Albert Knoll, a witness for the importers:

Salt of opium is unscientific; one can only speak of salts of morphia, salts of codeine, but not of salt of opium.

As there is no such thing as salts of opium, and as it not infrequently happens that in legislation as well as in literature a term signifying the whole is used to indicate a part, we think that the expression "salts of opium" as used in paragraph 43 should be interpreted to mean such salts as are produced by the chemical action of an acid radical on organic bases which are component parts of opium. This view of the case we think is fully supported by the reasoning of the United States District Court and the United States Circuit Court of Appeals in United States v. Merck & Co. (168 Fed., 244), in which the meaning of a similar provision providing for the free entry of "salts of cinchona bark" was determined.   In that case the merchandise submitted for classification was euquinine, which is not derived directly from cinchona bark, but from quinine, an alkaloid of cinchona bark, by the action of chlorocarbonic ethyl ether.   See United States Dispensatory (pp. 1485, 1036).   The collector of customs classified the euquinine as a medicinal preparation in the preparation of which alcohol was used.   The importers claimed that the euquinine was a salt of cinchona bark free of duty under paragraph 647, which reads as follows:

647. Quinia, sulphate of, and all alkaloids or salts of cinchona bark.

It appeared from the testimony that there was no such thing as a salt of cinchona bark.   The Board of General Appraisers sustained the collector's classification, but on appeal the United States District Court (Platt, Judge) reversed the board and held that euquinine was derived from cinchona bark in the same way as sulphate of quinia and that it was free of duty *as a salt derived from cinchona bark.* The decision of the District Court was affirmed in a *per curiam*

opinion of the Circuit Court of Appeals. The conclusion reached in United States *v.* Merck acquires added weight when it is considered that the derivation of euquinine from cinchona bark by the action of an ether on an alkaloid of cinchona bark is perfectly analagous to the derivation of codeine from opium by the action of methyl-ether on morphine, an alkaloid of opium.

The decision of the Board of General Appraisers is *affirmed*.